IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JAMES C. FORMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. CIV-05-62-M |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner, Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

James C. Forman ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405 (g) seeking judicial review of the defendant Commissioner's final decision denying Plaintiff's applications for disability insurance benefits and supplemental security income payments under the Social Security Act. This matter has been referred to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B). Upon review of the pleadings, the record ("Tr.") and the parties' briefs, the undersigned recommends that the Commissioner's decision be affirmed.

## Administrative Proceedings

Plaintiff initiated these proceedings by filing applications seeking disability insurance benefits and supplemental security income payments in May and July, 2002, respectively [Tr. 69 - 71 and 322 - 324]. He alleged that hepatitis C, impaired vision, bone/joint problems, limited stamina, neck and back pain as well as headaches became disabling as of March 9, 2001 [Tr. 81]. Plaintiff's claims were denied initially and upon reconsideration [Tr. 57 - 59, 61 - 62, 326 - 328 and 330 - 332]. An Administrative Law Judge ("ALJ") conducted an August, 2003, hearing where Plaintiff, who was represented

by a disability claim representative, a medical expert and a vocational expert testified [Tr. 333 - 383]. In his July, 2004, decision the ALJ found that Plaintiff was not disabled because he was able to perform work which existed in significant numbers in the national economy [Tr. 18 - 29]. The Appeals Council of the Social Security Administration declined Plaintiff's review request, and Plaintiff subsequently sought review of the Commissioner's final decision in this court [Tr. 6 - 8].

**Standard of Review**

This court is limited in its review of the Commissioner's final decision to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). However, while this court can neither reweigh the evidence nor substitute its own judgment for that of the ALJ, the court's review is not superficial. "To find that the [Commissioner's] decision is supported by substantial evidence, there must be sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988) (citation omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* at 299.

**Determination of Disability**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§§423(d)(1)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. See 20 C.F.R. §§404.1520(b)-(f), 416.920(b)-(f); *see also Williams v. Bowen*, 844 F.2d 748, 750-752 (10th Cir. 1988) (describing five steps in detail). Plaintiff bears the initial burden of proving that he has one or more severe impairments. 20 C.F.R. §§ 404.1512, 416.912; *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). Where Plaintiff makes a prima facie showing that he can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show that Plaintiff retains the capacity to perform a different type of work and that such a specific type of job exists in the national economy. *Turner,* 754 F.2d at 328; *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984). In this case, the ALJ determined that Plaintiff could not perform his past work and, therefore, continued the inquiry through the fifth step.

**Plaintiff's Claims of Error**

Plaintiff raises three specific claims of error, all relating to the ALJ's findings at step five of the sequential process. Plaintiff first maintains that the hypothetical questions posed to the vocational expert did not adequately reflect Plaintiff's visual and hepatitis C-related limitations; second, that the ALJ breached his duty to develop the record by failing to investigate and elicit a reasonable explanation for "conflicts between the presumptions in the *Dictionary of Occupational Titles"* ("DOT") [Doc. No. 16, p. 1]; and, finally, that the testimony of the vocational expert was impermissibly vague and in conflict with "the presumptions in the DOT." *Id.* Due to the specific and limited nature of Plaintiff's contentions, the following review of the ALJ's decision will encompass only findings pertinent to the claimed error and, consequently, will only briefly relate the ALJ's remaining, unchallenged findings.

**The ALJ's Decision**

The ALJ's decision reflects that Plaintiff – forty-four years old with a high school education – did not return to his work as a groundskeeper following a one-car motor vehicle accident occurring on March 9, 2001, his alleged onset of disability date [Tr. 18 - 20 and 26]. Plaintiff was treated at Enid's St. Mary's Regional Medical Center following the accident; the treating physician noted his impression: "1.  Motor vehicle accident with multiple contusions, lacerations and abrasions; 2.  Ethanol intoxication" [ Tr. 129 - 130].

In May, 2002, Plaintiff received a letter from Ron Gilcher, M.D., of the Oklahoma Blood Institute, advising that "[o]n your recent blood donation . . . the hepatitis C virus antibody test and a confirmatory test called the RIBA 3.0 were found to be positive." [Tr. 20 and 162]. Plaintiff was further advised to take the letter to his personal physician for further evaluation. *Id.*

The following month, Plaintiff was seen at the Enid Eye Clinic with regard to a pair of glasses with which he was having difficulty [Tr. 20 and 175]. Testing revealed that Plaintiff had been over-corrected; a change in correction, which the provider stated should be well-tolerated, corrected Plaintiff to 20/20. *Id.* He was instructed to return on an as-needed basis. *Id.*

In November, 2002, Vidya Rege, M.D., performed a complete, consultative eye examination [Tr. 22 and 233 - 235]. Dr. Rege's exam notes indicate that Plaintiff presented complaining of visual field defect in both eyes, reportedly as a result of a contusion of the brain, at the site of the optic nerve crossing, sustained in a 1977 car accident. *Id.* Plaintiff reported that the condition improved somewhat, but after another car accident eighteen

months ago, a CT scan and MRI were done, and he was told that he had old occipital infarction at two places which caused his field defect. *Id.* Upon examination, Dr. Rege made the following findings with respect to Plaintiff's visual field: OD[1] =130 degrees with scotoma[2]; OS[3] = 120 degrees with scotoma. Plaintiff's visual acuity without glasses was: OD = 20/200; OS = 20/400. With glasses, Plaintiff's visual acuity was 20/20. Dr. Rege diagnosed myopia and field defect[4] and recommended regular checkups. *Id.*

The ALJ's decision further reflects the pertinent diagnosis of Thomas Lynn, M.D., the medical expert in the case: hepatitis C, mild and not producing an impairment at this stage, and a brain injury which had reduced Plaintiff's vision fields [Tr. 24 and 341 - 345]. Dr. Lynn completed a Medical Source Statement of Ability to Do Work-Related Activities

---

[1] OD is an abbreviation for the Latin *oculus dexter*, right eye. *See Dorland's Illustrated Medical Dictionary,* p. 1166 (27th Ed. 1988).

[2] Scotoma is "an area of lost or depressed vision within the visual field, surrounded by an area of less depressed or of normal vision." *See Dorland's Illustrated Medical Dictionary,* p. 1498 (27th Ed. 1988).

[3] OS is an abbreviation for the Latin *oculus sinister,* left eye. *See Dorland's Illustrated Medical Dictionary,* p. 1193 (27th Ed. 1988).

[4] Vision impairment is discussed in a publication issued by the National Center on Birth Defects and Developmental Disabilities, Centers for Disease Control, Department of Health and Human Services:

> Vision impairment means that a person's eyesight cannot be corrected to a "normal" level. Vision impairment may be caused by a loss of visual acuity, where the eye does not see objects as clearly as usual. It may also be caused by a loss of visual field, where the eye cannot see as wide an area as usual without moving the eyes or turning the head.
>
> There are different ways of describing how severe a person's vision loss is. The World Health Organization defines "low vision" as visual acuity between 20/70 and 20/400, with the best possible correction, or a visual field of 20 degrees or less. "Blindness" is defined as a visual acuity worse than 20/400, with the best possible correction, or a visual field of 10 degrees or less. Someone with a visual acuity of 20/70 can see at 20 feet what someone with normal sight can see at 70 feet. Someone with a visual acuity of 20/400 can see at 20 feet what someone with normal sight can see at 400 feet. A normal visual field is about 160-170 degrees horizontally.

*See* http://www.cdc.gov/ncbddd/dd/ddvi.htm.

in which he found Plaintiff would have some limitations with respect to the scotoma, or visual field defects [Tr. 318 - 321].  In this connection, Dr. Lynn testified that Plaintiff would be limited "in the area of picking up rapid movements where it becomes important to do so, like in driving.  He should not be a cross-country driver or work around unfamiliar machines where there is a lot of motion.  It's going to be the motion that he has trouble making out." [Tr. 343].

Based upon the medical evidence, the ALJ determined that Plaintiff was severely impaired by decreased vision and osteoarthritis [Tr. 19].  Plaintiff was found to have the residual functional capacity ("RFC") to perform sedentary work but could only "occasionally climb stairs and ladders, balance, kneel, crouch and crawl. [Plaintiff] should avoid unprotected heights, dangerous moving machinery and should not drive over the road long distance.  The [Plaintiff] also has decreased vision." [Tr. 26].  The ALJ found that Plaintiff could no longer perform his past relevant work due to his impairments, and accordingly, the ALJ relied on the testimony of the vocational expert in finding that Plaintiff was capable of making a vocational adjustment to the following work: food and beverage clerk, unskilled and sedentary, with 500 positions in the regional economy and 28,000 nationally; order caller, unskilled and sedentary, with 800 positions in the regional economy and 72,000 nationally, and, polisher, unskilled and sedentary, with 900 positions regionally and 78,000 nationally [Tr. 27].  The ALJ found that Plaintiff retained the capacity for work existing in significant numbers in the national economy, and therefore, he was not under a disability as defined in the Social Security Act.  *Id.*

**<u>Testimony of the Vocational Expert as Substantial Evidence Supporting the ALJ's Step Five Determination</u>**

Plaintiff asserts initially that "the hypothetical questions used to elicit the vocational testimony must reflect with precision the claimant's characteristics and limitations either as the ALJ found them to be or as otherwise borne out by the evidentiary record." [Doc. 16, p. 8, *citing Decker v. Chater,* 86 F.3d 953, 955 (10th Cir. 1996). Specifically in this case, Plaintiff claims "that the hypothetical was flawed because it did not include limitations on the ability to perform activities requiring prolonged near acuity, such as reading, which were attributable to the additional decrease in vision the ALJ himself found to exist." [Doc. No. 16, p. 10]. In addition, Plaintiff claims the hypothetical was further flawed because the ALJ failed to ask the vocational expert to consider that Plaintiff had been diagnosed with hepatitis C.

With regard to his hepatitis C, Plaintiff argues:

> Hepatitis is a very infectious disease. One does not have to be a vocational expert to recognize that a person with documented Hepatitis is not going to be allowed to have a food handler's permit or be allowed to work in an establishment that sells food to the general public. One of the alternative jobs cited by the VE was a food and beverage order clerk, such as those who take orders at drive-thru, fast food restaurants. It is common knowledge that such workers not only take orders and handle the money, but also commonly prepare beverages and serve items prepared by others, such as french fries. Plaintiff submits that a person with Hepatitis would be precluded, if not by law, at least by practice from performing such a job.[5]

[Doc. No. 16, p. 11].

---

[5] It is worth noting that Plaintiff's "evidence" in this regard is not a part of the administrative record but was proffered by Plaintiff in his briefing on appeal. Nonetheless, when the Commissioner countered Plaintiff's hepatitis argument with her own hepatitis information [Doc. No. 18, p. 6], Plaintiff replied, stating that the Commissioner was improperly providing a post hoc argument. It is also worth noting that Plaintiff's citation to Oklahoma health standards for food service workers pertains to food service within the Oklahoma Department of Corrections [Doc. No. 19, p.7].

Plaintiff's theory with respect to Plaintiff's hepatitis C fails for two reasons. First, the argument that Plaintiff has a disease which is highly contagious and which he could spread as a food handler reflects Plaintiff's confusion of hepatitis A – "spread by putting something in the mouth (even though it may look clean) that has been contaminated with the stool of a person with hepatitis A"[6] – with hepatitis C – "spread through sharing needles or "works" when "shooting" drugs, through needlesticks or sharps exposures on the job, or from an infected mother to her baby during birth."[7] Second, the vocational expert specifically testified that she was not identifying a job in the fast food business but rather one that was a call-in order type position in hotels or restaurants [Tr. 381]. This is consistent with the description of the position in the *Dictionary of Occupational Titles* (" DOT"):

> Takes food and beverage orders over telephone or intercom system and records order on ticket: Records order and time received on ticket to ensure prompt service, using time-stamping device. Suggests menu items, and substitutions for items not available, and answers questions regarding food or service. Distributes order tickets or calls out order to kitchen employees. May collect charge vouchers and cash for service and keep record of transactions. May be designated according to type of order handled as Telephone-Order Clerk, Drive-In (hotel & rest.); Telephone-Order Clerk, Room Service (hotel & rest.).

DICOT 209.567-014.

Plaintiff admits for purposes of his argument that the ALJ "adequately accommodated the fatigue and weakness [Plaintiff] experienced as a result of his Hepatitis" by limiting him to less than a full range of sedentary work [Doc. No. 16, p.11]. And,

---

[6] http://www.cdc.gov/ncidod/diseases/hepatitis/a/fact.htm.

[7] http://www.cdc.gov/ncidod/diseases/hepatitis/c/fact.htm.

8

because Plaintiff has not established that there were any additional limitations associated with hepatitis C which the ALJ should have included in his hypothetical questioning to the vocational expert, the ALJ committed no error in this regard.

Plaintiff's remaining argument with respect to restrictions which the ALJ should have included in his hypothetical questioning relates to Plaintiff's vision. First, Plaintiff suggests that there is uncertainty about the meaning of the ALJ's RFC determination that "[t]he claimant also has decreased vision." [Tr. 26]. The undersigned disagrees. The evidence unequivocally establishes that Plaintiff has field defect, i.e., a loss in his visual field, and the ALJ properly included the fact that Plaintiff's vision was decreased[8] in the RFC along with resulting limitations.[9]

As the second prong of his argument regarding the ALJ's hypothetical questions, Plaintiff asserts "that the hypothetical was flawed because it did not include limitations on the ability to perform activities requiring prolonged near acuity, such as reading, which were attributable to the additional decrease in vision the ALJ himself found to exist." [Doc. No. 16, p.10]. Plaintiff argues that the medical evidence – specifically, the report of Dr. Rege – supports Plaintiff's testimony that his near acuity is limited in that Dr. Rege, an eye specialist, found large areas of scotoma or lost vision inside Plaintiff's central visual field.

---

[8]Plaintiff further argues that the ALJ erred by not including any specific restrictions with respect to "decreased vision" in his hypothetical questioning. As Plaintiff observed, however, the DOT provides guidance regarding the amount of time a particular activity, or "physical demand," is called for in an occupation. For example, Plaintiff demonstrates that "near acuity" is necessary for the order clerk and two polisher positions which the vocational expert identified as appropriate for an individual with Plaintiff's RFC [Doc. No. 16, p.13]. By the same token, another physical demand listed in the DOT is "field of vision." The undersigned's review of the DOT reveals that "field of vision" is not included as a physical demand of any of the three positions at issue, and the failure of the ALJ to specifically reference "decreased vision" in his hypothetical questioning is not reversible error. *See* DICOT 713.684-038, 713.687-034 and 209.567-014.

[9]With respect to any uncorrectable loss of visual acuity, the ALJ found none, specifically noting that "[u]pon examination, the claimant's visual acuity was 20/20 on the right and left bilaterally." [Tr. 21].

Plaintiff then suggests that "[m]edical literature explains that scotomas in the central field may severely affect the ability to perform tasks such as reading [and that] the findings of central field scotoma in Dr. Rege's report findings support [Plaintiff's] testimony regarding his problems with tasks requiring near acuity, such as reading." [Doc. No. 19, p. 4 - 5].

While it is true that Dr. Rege did, indeed, document the presence of scotoma in Plaintiff's central visual field [Tr. 234], he also made specific findings with regard to Plaintiff's central visual acuity, i.e., the "[r]emaining central vision in the better eye after best correction." [Tr. 235]. Dr. Rege noted the scotoma but also specifically found that Plaintiff's *near acuity* in both eyes after correction was 20/20. *Id.* Accordingly, the objective medical evidence[10] in the case establishes that Plaintiff was not impaired by a loss of visual acuity, either near or at a distance, and the ALJ did not commit error by failing to include a restriction in his hypothetical questioning which was not "borne out by the evidentiary record." *Decker,* 86 F.3d at 955 [Doc. No. 16, p.8].

Because the objective medical evidence established that Plaintiff has near visual acuity of 20/20, the testimony of the vocational expert that Plaintiff could perform the sedentary, unskilled jobs of polisher and the sedentary, unskilled job of order clerk, food and beverage, does not conflict with the DOT which provides that frequent or constant near acuity is a physical demand of such jobs.[11] Consequently, in the absence of a conflict,

---

[10]Plaintiff argues that "[b]ecause the medical evidence objectively demonstrated that [Plaintiff] had a visual impairment capable of causing the type of visual problems he complained of, the ALJ was bound to consider all the relevant objective and subjective evidence and decide whether he believed [Plaintiff's] description." [Doc. No. 19, p.5]. Contrary to Plaintiff's assertion, there is no such objective medical evidence.

[11]While there was no conflict between the vocational expert's testimony and the DOT description, the ALJ did not affirmatively ask the vocational expert if there was any possible conflict between her testimony and the DOT information as mandated by Social Security Ruling 00-04p, 2000 WL 1898704, at
(continued...)

10

the ALJ was entitled to rely on the vocational expert's identification of the job of order clerk, food and beverage, and the polisher positions as evidence in support of the Commissioner's burden at step five of the sequential process. *See Haddock v. Apfel,* 196 F.3d 1084, 1091 (10th Cir. 1999) ("the ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability").

## **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be affirmed. The parties are advised of their right to object to this Report and Recommendation by January 19, 2006 in accordance with 28 U.S.C. §636 and Local Civil Rule 72.1. The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991). This

---

$^{11}$(...continued)

*4:
    When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:
    Ask the VE . . . if the evidence he or she had provided conflicts with information provided in the DOT; and
    If the VE's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

The ALJ's failure to adhere to a simple requirement of an agency ruling is certainly not a practice to be condoned. Nonetheless, because there was no conflict between the vocational expert's testimony and the DOT information in this case and because no prejudice resulted to Plaintiff as a result of the ALJ's technical omission, remand is not justified. *See Gibbons v. Barnhart,* No. 03-6021, 2003 WL 22969357 (10th Cir. Dec. 18, 2003)(unpublished op. cited as persuasive authority)(failure of the ALJ to determine whether conflicts existed between the vocational expert's testimony and the DOT did not warrant remand where it was clear from the record that the vocational expert was relying on the DOT). Here, it is likewise clear from the record that the vocational expert was relying on the DOT [Tr. 377].

Report and Recommendation disposes of all issues referred to the Magistrate Judge in this matter.

ENTERED this 30th day of December, 2005.

_____
BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE